UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Michelle Byrd, | ) | C/A No. 5:11-cv-03340-MGL-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Report and Recommendation |
| South Carolina Department of Corrections, | ) | |
| Sergeant Boyd, Captain Austin, Major Rawski, | ) | |
| Lieutenant Hill, and Officer Yeldell, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Plaintiff, a former inmate with the South Carolina Department of Corrections ("SCDC"), filed this 42 U.S.C. § 1983 action alleging that, while in SCDC custody, Defendants violated her constitutional rights. This matter is before the court on the Motion for Summary Judgment filed by Defendants on November 16, 2012. ECF No. 27. Plaintiff responded to Defendants' Motion for Summary Judgment on February 18, 2013, and Defendants replied to Plaintiff's response on April 26, 2013, making the summary judgment motion ripe for consideration. ECF Nos. 39, 51. This case was referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C.[1] Because Defendants' Motion is dispositive, a Report and Recommendation is entered for the court's review.

I.     Procedural Background

On September 20, 2011, Plaintiff filed her Complaint in the Greenwood County Court of Common Pleas. Defendants removed the action to federal court on December 8, 2011 pursuant to the provisions of 28 U.S.C. § 1446. ECF No. 1 at 1. In her Complaint, Plaintiff brings claims

---

[1] On January 2, 2012, this matter was reassigned from United States Magistrate Judge Shiva V. Hodges to the undersigned. ECF No. 10.

under 42 U.S.C. § 1983 ("§ 1983") for violations of her Fourteenth Amendment rights, and claims under South Carolina law for gross negligence, negligent supervision, negligent training, assault, and battery—all related to an assault by another inmate that occurred on September 18, 2010. ECF No. 1-1.   Plaintiff seeks actual and punitive damages, attorneys' fees, costs, and disbursements. *Id.*

II.     Standard of Review

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

III.    Facts

Plaintiff Michelle Byrd is a former inmate who was housed at SCDC's Leath Correctional Institution ("Leath") at the time of the events in question. ECF No. 1-1. She was released from SCDC in December 2010. Byrd Dep. 23:25-24:2, ECF No. 39-4. Plaintiff brings this § 1983 action against the following Defendants: Captain Debra Austin who was the Yard Supervisor at Leath; and Sergeant Miranda  Boyd, Major Angelina Rawski, Lieutenant Valerie Hill, and Officer Angel Fox-Yeldell who were corrections officers employed at Leath at the same time Plaintiff was at Leath; and the SCDC. Austin Dep. 4:14-15; 6:13-17, ECF No. 40-3; Boyd Dep. 4:14-19; 6:3-12, ECF No. 40-2; Rawski Dep. 4:14-16; 5:14-22, ECF No. 40-6; Hill Dep. 4:14-17; 5:5-8, ECF No. 40-5; Yeldell Dep. 4:14-24; 5:10-11, ECF No. 40-7.  Inmate Linda Ann Tyler ("Inmate Tyler" or "Tyler") is a long-time inmate in the SCDC and was housed at Leath during the time period relevant to Plaintiff's Complaint.[2] Tyler Dep. 9:16-11:13; 14:21-15:6, ECF No. 39-3. While at Leath, Inmate Tyler was written up approximately 60 times, was disciplined at least four times for fighting, and had been placed in lock-up on three separate occasions for assaulting other inmates.  *Id.* at 15:7-19:9; 43:2-21; 46:4-47:3; 52:18-19.  Inmate Tyler also had a history of violent confrontations with inmates with whom she was involved in a relationship, or with persons in whom she was interested romantically. *See* Tyler Incident Reports, ECF No. 39-10 at 19-21, 22-25, 27-29; Yeldell Dep. 6:9-14, ECF No. 27-11; Young Dep. 11:13-18, ECF No. 41-5.

Plaintiff arrived at Leath in April 2010. Byrd Dep. 23:20-24, ECF No. 39-4. According to the SCDC website, Leath is a level-three female institution. "Level 3 facilities are high-security institutions designed primarily to house violent offenders with longer sentences, and inmates who exhibit behavior problems. . . . Inmates at level 3 facilities are closely supervised and their

---

[2] Tyler, the inmate who injured Plaintiff, is not named as a Defendant in this action.

activities and movement within the institution are highly restricted." *See* SCDC website, http://www.doc.sc.gov/pubweb/institutions/institutions.jsp (last visited July 22, 2013).[3] The Phoenix dorm at Leath consists of two separate wings, Phoenix A and Phoenix B. Rawski Dep. 11:7-19, ECF No. 27-10. Inmates housed in Phoenix A are not allowed to "pass back-and-forth" between the wings, but it is possible for them to do so. *Id.* at 11:20-23. According to Defendant Rawski, the Phoenix unit was designed as a mental health unit, and the majority of inmates assigned to the unit "were on mental health." *Id.* at 19:11, 23-25. Plaintiff was assigned to Phoenix A dorm and Inmate Tyler was housed in Phoenix B dorm. Tyler Dep. 19:15-17, ECF No. 39-3. Inmate Tyler met Plaintiff in July 2010, and they began a non-sexual relationship. *Id.* at 19:10-12; 21:3-12. According to Inmate Tyler, as part of their relationship Inmate Tyler would give Plaintiff some of her canteen, which included "soap and everything else that she need[ed]." *Id.* at 21:10-11. In August 2010, Inmate Tyler began threatening Plaintiff and began demanding sex. Byrd Dep. 43:18-44:19, ECF No. 39-4. Plaintiff testified that Inmate Tyler would force Plaintiff to write letters to her so that Inmate Tyler could then show the letters to the guards as proof that they were involved in a relationship. Byrd Dep. 40:17-41:20; 46:2-4; 102:3-8, ECF No. 39-4.

On August 26, 2010, Plaintiff told Defendant Lieutenant Hill that Inmate Tyler wanted Plaintiff to be in a relationship with her but that Plaintiff did not want to be in a relationship; rather Plaintiff told Defendant Hill that she wanted Inmate Tyler to stop talking to her. Hill Dep. 9:5-8, ECF No. 40-5. That same day, August 26, 2010, Defendant Hill offered Plaintiff protective custody, which Plaintiff declined. Hill Dep. 9:9-10; 12:6-22; 13:2-14, ECF No. 40-5;

---

[3] "The court may take judicial notice of factual information located in postings on government websites." *Cox v. Ozmint*, C/A No. 3:12-000225-TMC-JRM, 2012 WL 1415181, at *2 n.2 (D.S.C. Mar. 19, 2012) (citing *In re Katrina Canal Beaches Consol. Litig.*, No. 05-4182, 2008 WL 4185869 at *2 (E.D. La. Sept. 8, 2008)).

Form Declining Protective Custody, ECF No. 27-5. Inmates on protective custody have one hour of recreation time alone and are not allowed to room with another inmate unless that inmate is also in protective custody and there is a shortage of cells. Rawski Dep. 23:23-24-12, ECF No. 27-10.  Essentially, an inmate in protective custody would be in her cell all day except for the one-hour recreation, and for 15-minute showers three days a week. *Id.* at 24:21-25:6. After Plaintiff declined protective custody, Defendant Hill told Plaintiff to come back and talk to her (Hill) if Inmate Tyler continued to make sexual advances toward her. Hill Dep. 14:1-6, ECF No. 40-5.   Also on that same day, Defendant Captain Austin left a note for other corrections officers that stated "Linda Tyler[,] Rm 131 cannot go on rec field while [Phoenix A] is on their Rec[reation]." Handwritten note, ECF No. 40 at 2 (signed by Austin). On August 27, 2010, Plaintiff spoke with a mental health counselor and reported that she was experiencing problems with Inmate Tyler and was afraid Tyler would "jump on her." Byrd Dep. 37:5-38:10, ECF No. 39-4.  The counselor wrote in her notes that she would inform Dorm Officer Jackson, Lieutenant Hill, and Captain Austin about the situation. ECF No. 39-5 at 14.

In the weeks before the final assault, Inmate Tyler hit Plaintiff in the face on three separate occasions because Inmate Tyler did not like how Plaintiff was interacting with other inmates. Byrd Dep. 70:4-14, ECF No. 39-4; Tucker Dep. 17:2-8, ECF No. 41-4; Young Dep. 12:19-23, ECF No. 41-5.  In late August or early September 2010, Plaintiff told Officer Jackson that Inmate Tyler was hitting her and that she was tired of Plaintiff hitting and threatening her. Byrd Dep. 102:19-103:4, ECF No. 39-4. Officer Jackson told Plaintiff she needed to "quit crying wolf, you keep crying wolf ain't nobody going to believe you." *Id.* at 103:6-7. In early September 2010, Plaintiff told Inmate Tyler that she no longer wanted to be her friend or have a relationship with her. Byrd Dep. 62:21-63:2, ECF No. 39-4. However, Inmate Tyler continued to

approach Plaintiff and became angry when Plaintiff no longer accepted canteen items from her. *Id.* at 63:7-12, ECF No. 39-4; Tucker Dep. 19:2-20:15, ECF No. 41-4. Plaintiff testified that she was trying to be friends with Inmate Tyler, but that Tyler "wanted to take it to another level. She started giving me snacks and stuff and candy and try to control me and stuff and make me do what she wanted me to do." Byrd Dep. 38:19-23, ECF No. 39-4. Inmate Tyler testified that in the first week of September 2010, she confronted Plaintiff upon learning that Plaintiff was involved with another inmate. Tyler Dep. 23:1-24: 25, ECF No. 39-3. Tyler stated that Plaintiff continued to see the other inmate whom Tyler characterized as Plaintiff's ex-girlfriend. Tyler Dep. 25:1-5, ECF No. 39-3.

A week before the assault on September 18, 2010, Inmate Dawn Tucker was with Plaintiff when Plaintiff talked to Sergeant Weaver about Inmate Tyler. Tucker Dep. 23:19-24:4; 25:10-25, ECF No. 41-4. Tucker testified that Plaintiff told Sergeant Weaver that "she was scared of Linda [Tyler]. . . .That Linda was stalking her, and she did not know what to do." *Id.* at 24:7-8. Inmate Tucker stated that Sergeant Weaver laughed in response and told Plaintiff to "just leave [Inmate Tyler] alone." *Id.* 24:9-16. Two days later, Inmate Tucker was present when Plaintiff had another conversation with Defendant Hill in the cafeteria. Tucker Dep. 26:1-15, ECF No. 41-4. Tucker testified that Plaintiff told Hill that she was being stalked by Inmate Tyler and that Inmate Tyler was sending things to her room, writing her letters, grabbing on her, pulling on her, and slapping her around. *Id.* at 27:3-8. Tucker stated that Plaintiff told Hill that "she was scared for her life." *Id.* at 27:14-15. Tucker stated that Defendant Hill did the same thing as Sergeant Weaver—she laughed and told Plaintiff to stay away from Tyler. *Id.* at 27:8-9. Defendant Hill told Plaintiff that they were going to move her. Tucker Dep. 12:18-24, ECF No. 41-4. Inmate Tucker also testified that Plaintiff told Defendant Sergeant Boyd a week before the

incident that "she was scared and [Inmate Tyler] was stalking her [and] was sending her cookies and stuff and she didn't want them." Tucker Dep. 55:1-6, ECF No. 41-4. Defendant Boyd responded "[i]t ain't none of my business." *Id.* at 55:7-8.

Inmate Tyler testified that a few days before the assault, she spoke with Defendant Officer Yeldell. Yeldell asked Tyler whether she was threatening Plaintiff. Yeldell told Inmate Tyler that if she heard about her threatening Plaintiff again, Inmate Tyler was "going to lock-up." Tyler Dep. 62:23-63:5, ECF No. 39-3. On Tuesday or Wednesday before this encounter, Defendant Boyd told Inmate Tyler "to leave [Plaintiff] alone because [Plaintiff was] a liar" who would tell everyone something different. Tyler Dep. 63:12-64:3, ECF No. 39-3. Inmate Young testified that, after Inmate Tyler's conversation with Defendant Boyd, Boyd told Plaintiff "that they had handled the situation." Young Dep. 15:5-17, ECF No. 41-5. Young stated that she did not think Plaintiff was "satisfied with what was happening because she said they was supposed to move her and she never did get moved." *Id.* at 15:18-20. According to Plaintiff's Medical Summary, on September 16, 2010, Plaintiff requested to be seen in the mental health clinic. Pl.'s Med. Summ., ECF No. 39-5 at 14. Plaintiff reported to her mental health counselor that she was still "having problems with [Inmate] Linda Tyler" and, although she had previously "cried wolf somewhat the last time," that Inmate Tyler was "hitting her now and threatening to beat her up." *Id.* Plaintiff stated that she did not want to go to protective custody, but "wanted to know [if she could] be transferred to another institution." *Id.* Plaintiff's counselor noted that she would make security aware of Plaintiff's claims. *Id.*

Plaintiff testified that on the day before the September 18, 2010 incident at issue, Inmate Tyler was walking Plaintiff from school and they saw Defendant Yeldell. Byrd Dep. 46:6-13, ECF No. 39-4. Inmate Tyler asked to speak with Defendant Yeldell, and Yeldell told Tyler to

"go on about her business, go on to her building." *Id.* at 46:13-15. Yeldell asked Plaintiff what Inmate Tyler was doing to her. Plaintiff responded that Inmate Tyler was hitting on her, and Plaintiff asked Yeldell whether she could do something. *Id.* at 46:16-18. Plaintiff testified that Yeldell told her, "[D]on't worry about it, I'll fix it." *Id.* at 46:18-19. Based on rumors she heard about Inmate Tyler and Plaintiff, Defendant Yeldell told Inmate Tyler that she could no longer come to the education department at eight o'clock and "that would stop any interference or anything going on." Yeldell Dep. 9:21-10:13, ECF No. 40-8. Inmate Tyler testified that on September 17, 2010, she "personally took" Plaintiff to see Defendant Major Rawski so Plaintiff could tell the Major that Inmate Tyler was not hitting her. Tyler Dep. 29:11-30:6, ECF No. 39-3. Inmate Tyler stated that Defendant Austin told her "they put [Plaintiff] on curfew so that we couldn't be together and they didn't want [Tyler] outside if [Plaintiff] was outside." *Id.* at 30:7-10. Additionally, Inmate Tyler's tutoring was limited to two days a week so that she and Plaintiff would not be in the education building at the same time. *Id.* at 30:10-14. That evening, Inmate Tyler walked over to Plaintiff's dorm, Phoenix A, and saw Plaintiff with the "white girl"[4] whom other inmates had told Inmate Tyler that Plaintiff was dating. Tyler Dep. 26:18-28:6, ECF No. 39-3.

Inmate Tyler testified that before brunch on the morning of the assault, September 18, 2010, she saw Plaintiff "hugged up" with the "white girl." Tyler Dep. 28:1-6, ECF No. 39-3. Later that morning, after breakfast, Inmate Tyler "had her hair braided back and [was] greased up." Byrd Dep. 47:4-6; ECF No. 39-4. Plaintiff's fellow inmates and Defendant Hill testified that when Inmate Tyler was "greased up" and had her hair braided that she was getting ready to fight. *Id.* at 47:6-8; Tucker Dep. 37:6-38:24, ECF No. 41-4; Young Dep. 24:1-6, ECF No. 41-5; Rainey

---

[4] No name is provided for this inmate, and she is referenced as "white girl" in the deposition transcripts that were submitted to the court.

Dep. 13:3-10; 24:13-20, ECF No. 41-1; Hill Dep. 7:19-8:2, ECF No. 40-5; *see also* ECF No. 39-10 at 18 (July 2008 Tyler Incident Report noting inmates' statements that Tyler "grease[d] herself with Vaseline" when she was ready to fight.). Inmate Tyler testified that when Defendant Austin saw Plaintiff and Inmate Tyler together she called Plaintiff over to her. Tyler Dep. 28:9-19, ECF No. 39-3. Captain Austin instructed Tyler to "go ahead on," but Tyler refused and stated she would wait for Plaintiff. *Id.* Defendant Austin asked Plaintiff, in front of Tyler, why she was with Inmate Tyler when Plaintiff had reported to officers that Tyler was threatening her. *Id.* Plaintiff denied that she told any officer that Inmate Tyler was threatening her, and Inmate Tyler asked Plaintiff why she had been telling officers that Tyler was threatening her.[5] *Id.*

After the brunch meal, when Plaintiff was leaving the cafeteria, a fellow inmate who was in line with Plaintiff encouraged her to tell Defendant Austin that she was afraid to continue walking where Tyler was standing. Reid Dep. 21:15-21, ECF No. 41-2. Inmate Reid testified that Defendant Austin told Plaintiff that Tyler would not touch her and to continue walking. *Id.* at 21:21-22. Inmate Richardson testified that when Plaintiff told Defendant Austin that she was afraid of Tyler, Austin "thought it was funny, she just like laughed at it and brushed it off." Richardson Dep. 17:16-17, ECF No. 41-3. Inmate Tucker also testified that, when Plaintiff told Defendant Austin that Tyler was "after her," Defendant Austin "just laughed it off" and told Plaintiff they would "straighten it out later." Tucker Dep. 39:16-21, ECF No. 41-4. As Plaintiff walked towards her dorm and passed by Inmate Tyler, the "white girl" walked by and told Plaintiff to "come on." Tyler Dep. 31:10-13, ECF No. 39-3. Inmate Tyler, upset with Plaintiff for "cheating" on her, cut Plaintiff's face with a razor when Plaintiff tried to walk away. *Id.* at 31:14-17. Plaintiff received two lacerations to the right side of her face and was transported via

---

[5] Plaintiff asserts in her Brief that she "should never have been confronted by SCDC guards in front of her aggressor." ECF No. 39-1 at 21.

ambulance to the hospital for sutures. *See* Pl.'s Med. Summ., ECF No. 39-5 at 12-13. Plaintiff's

face is permanently scarred. Compl. ¶ 28, ECF No. 1-1.

IV.     Analysis

    A.  Defendants' Motion for Summary Judgment

        1.   Failure to Exhaust

Defendants contend that they are entitled to summary judgment on Plaintiff's § 1983

claim because Plaintiff has not exhausted her administrative remedies as required by the Prison

Litigation Reform Act ("PLRA"), specifically 42 U.S.C. § 1997e. ECF No. 27-1 at 3-4.

  Section 1997e(a) provides that "[n]o action shall be brought with respect to prison

conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in

any jail, prison, or other correctional facility until such administrative remedies as are available

are exhausted."   This requirement "applies to all inmate suits about prison life, whether they

involve general circumstances or particular episodes, and whether they allege excessive force or

some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). To satisfy this requirement, a

plaintiff must avail himself of all available administrative review. *See Booth v. Churner*, 532

U.S. 731 (2001). "[T]hose remedies need not meet federal standards, nor must they be 'plain,

speedy, and effective.'" *Porter*, 534 U.S. at 524 (quoting *Booth*, 532 U.S. at 739).

Satisfaction of the exhaustion requirement requires "using all steps that the agency holds

out, and doing so properly." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (quoting *Pozo v.*

*McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). Thus, "it is the prison's requirements, and

not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199,

218 (2007).  Defendants have the burden of establishing that a plaintiff failed to exhaust his

administrative remedies. *Anderson v. XYZ Corr. Health Servs.*, *Inc.*, 407 F.3d 674, 683 (4th Cir.

2005). However, '[d]efendants may . . . be estopped from raising non-exhaustion as an

affirmative defense when prison officials inhibit an inmate's ability to utilize grievance procedures.'" *Stenhouse v. Hughes*, C/A No. 9:04-23150-HMH-BHH, 2006 WL 752876, at *2 (D.S.C. Mar. 21, 2006) (quoting *Abney v. McGinnis*, 380 F.3d 663, 667 (2d Cir. 2004)).

Defendants offer the affidavit of Ann Hallman, SCDC Branch Chief of the Inmate Grievance Branch, who attests that Plaintiff filed one grievance regarding the September 18, 2010 incident, and that this grievance was returned in October 2010 unprocessed because Plaintiff had not stated how and when she had attempted informal resolution after the incident occurred. Hallman Aff. ¶¶ 3-5, ECF No. 27-2. Hallman avers that Plaintiff was given until November 22, 2010 to re-file the grievance but that she did not do so. *Id.* ¶ 5. Defendants contend that Plaintiff therefore failed to exhaust her administrative remedies as to her § 1983 claim arising out of the September 18, 2010 incident. ECF No. 27-1 at 5.

Plaintiff, citing to *Wilson v. Hampton County,*[6] contends that the PLRA does not apply to her case because she was no longer an inmate when she filed her § 1983 action. ECF No. 39-1 at 25.  Plaintiff also argues that she left Leath before her grievance was processed and that her grievance was not transferred to her new institution, Camille Graham Correctional Institution ("Camille Graham"), as was required by SCDC's Inmate Grievance Policy.[7]  *Id.* at 26.  Plaintiff argues that she was not able to proceed to the next step and appeal her grievance because Leath never responded to her grievance.  *Id.*

In reply, Defendants argue that the *Wilson* case is not applicable to Plaintiff's claims. ECF No. 51 at 2.  Defendants contend that, unlike the grievance policy at issue in *Wilson,* which

---

[6] C.A. No. 9:05-1777-PMD, 2005 WL 2877725 (D.S.C. Oct. 31, 2005).
[7] Paragraph 18.2 of SCDC's Inmate Grievance Policy states that:  "[i]f a grievant is transferred from one SCDC institution to another while a grievance is in progress, the Institutional Inmate Grievance Coordinator at the losing institution will forward the inmate's grievance via confidential, interdepartmental mail to the Institutional Inmate Grievance Coordinator at the gaining institution within five (5) days of the inmate's transfer.  ECF No. 40-1 at 10.

did not limit the time an inmate could file a grievance, Plaintiff had a specified time to submit a grievance. *Id.* Defendants argue that, when Plaintiff failed to re-file her grievance by November 22, 2010, she failed to exhaust her administrative remedies. *Id.* Defendants further contend that Plaintiff did not have a pending grievance at the time of her transfer, and therefore, Paragraph 18.2 does not apply to Plaintiff's claims. *Id.* at 3. Hallman attests that if Plaintiff was transferred to another institution she could have re-filed her grievance at the new institution, which would have forwarded the grievance to Leath. *Id.* at ¶ 6.

The undersigned finds that this District has agreed with the great weight of authority holding the exhaustion requirement does not apply to suits filed by former prisoners. *Wilson v. Hampton Cnty.*, No. 9:05–1777–PMD, 2005 WL 2877725, at *3 (D.S.C. Oct. 31, 2005) ("[I]n light of both the statutory language and the relevant case law from other circuits, the Court holds that the exhaustion-of-remedies requirement in the PLRA does not apply to plaintiffs who file § 1983 actions after being released from prison."); *see also Randolph v. State*, 74 F. Supp. 2d 537, 541 (D. Md. 1999) (holding plaintiff was not a "prisoner" as defined by the PLRA when he filed suit).

Additionally, the undersigned finds that Defendants appear to have inhibited Plaintiff's ability to use the grievance system by failing to forward Plaintiff's pending grievance to her new institution after Plaintiff was transferred. The testimony in the record shows that Plaintiff was transferred to Camille Graham a week to ten days after the September 18, 2010 incident, which would place Plaintiff at Camille Graham around September 28, 2010. *See* Byrd Dep. 11:21-25, ECF No. 39-4. Because Plaintiff's grievance was not processed until October 2010—a month after her transfer—Plaintiff did have a pending grievance at the time of her transfer. Once processed, Defendants should have forwarded the grievance to Camille Graham per SCDC

policy.  As there is no evidence in the record that Plaintiff's grievance was transferred, the undersigned finds that SCDC's actions prevented Plaintiff from availing herself of the grievance process.  "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008); *see also Stenhouse*, 2006 WL 752876 at *2 ("[E]xhaustion may be achieved in situations where prison officials fail to timely advance the inmate's grievance or otherwise prevent him from seeking his administrative remedies.").  Accordingly, Defendants are not entitled to summary judgment for Plaintiff's failure to exhaust administrative remedies.

### 2.  Due Process Claim - Assault by Another Inmate

Defendants contend that Plaintiff's due process claim should be dismissed because Plaintiff cannot show a due process violation.  ECF No. 27-1 at 5.  The Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (citation omitted). Prison officials are not, however, expected to prevent all inmate-on-inmate violence. *Farmer,* 511 U.S. at 834. To establish that prison officials are liable under § 1983 for failure to protect an inmate from violence at the hands of other inmates, a plaintiff must show: (1) "serious or significant physical or emotional injury," *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003), and (2) the prison officials had a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (internal quotation marks omitted); *see Odom v. S.C. Dep't of Corr*., 349 F.3d 765, 770 (4th Cir. 2003). As to the first prong, "[o]nly extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta*, 330 F.3d at 634. As to the second, the requisite state of mind is one of "deliberate indifference" to the inmate's health or safety. *Farmer*, 511 U.S. at 834.  A prison official shows deliberate

indifference if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Defendants argue that Plaintiff was offered protective custody on August 26, 2010, the date she first made complaints to staff about Inmate Tyler, and Plaintiff chose to remain in the prison's general population.  ECF No. 27-1 at 7. Defendants contend that protective custody continued to be available to Plaintiff up to and including the date of the incident September 18, 2010, and that Plaintiff was aware that "she could choose to be placed on protective custody at any time."  *Id.*  Defendants further argue that Defendant Austin "questioned the Plaintiff on the morning of the incident as to why she continued to be around inmate Tyler." Defendants argue their actions demonstrate they were not deliberately indifferent to Plaintiff's safety, and that "Plaintiff's own conduct in being involved with other inmates, while being less than truthful with inmate Tyler, clearly increased the likelihood that inmate Tyler would respond." *Id.* at 8.

In response to these arguments, Plaintiff contends that an offer of protective custody was not a reasonable response to Plaintiff's concerns about Inmate Tyler because Plaintiff's borderline intellectual functioning, severe mental health issues, and history of victimization did not allow Plaintiff to assess the risks in prison.  ECF No. 39-1 at 32.  Plaintiff argues that Defendants should have placed her in "administrative protective custody against her wishes" because she did not have the capacity to realize that she was in danger.  *Id.* at 30.  Plaintiff also contends that she believed that "something was being done and that she would be transferred." *Id.* at 33. Plaintiff further contends that given Inmate Tyler's history of sexual and physical aggression towards women with whom she was romantically involved or was pursuing, Tyler should not have been out in the general population.  *Id.* at 33.  Additionally, Plaintiff argues that

14

once Tyler was in a relationship with Plaintiff and Plaintiff complained to the SCDC officers, the Defendants "should have isolated one or the other." *Id.* Plaintiff further argues that on the day of the attack, Inmate Tyler's appearance showed that she was preparing for a fight, and although Plaintiff and other inmates attempted to get help from Defendant Austin regarding the potential assault, "no one was there to help [Plaintiff]." *Id.* Plaintiff argues that "[w]hen the facts are viewed in a light most favorable to Plaintiff, Defendants, and any reasonable officer, were on notice that Plaintiff needed protective custody to maintain her safety." *Id.* at 34.

Plaintiff also cites to the Prison Rape Elimination Act of 2003 ("PREA")[8] and SCDC's PREA Policy in support of her arguments. ECF No. 39-1 at 31. Plaintiff contends that she should have been identified as an inmate vulnerable to sexual assault and victimization, Inmate Tyler should have been classified as a sexual predator under the PREA, and Defendants should have acted accordingly. *Id.* at 31, 33.

In response, Defendants argue that Plaintiff acknowledges that, after August 26, 2010, she could have been placed in protective custody at any time, and that it was Plaintiff's choice to remain in the general population. ECF No. 51 at 6. Defendants contend that Plaintiff's allegations that she was unable to make an intelligent choice concerning protective custody are not supported by the record. *Id.* at 7. Defendants allege that "Plaintiff's own conduct of being involved with other inmates, while being less than truthful with inmate Tyler, clearly increased the likelihood that inmate Tyler would respond." *Id.* Defendants argue that they cannot be required to protect an inmate "whose conduct causes an altercation." *Id.* at 8 (citing *Clark v. Johnson*, 181 F. App'x 606, 607 (7th Cir. 2006)). Defendants argue finally that the PREA does not apply in this case because the attack "was not a sexual assault under PREA," Plaintiff was

---

[8] 42 U.S.C. § 15601.

not a "victim of sexual assault" as defined under PREA, and inmate Tyler did not have a history of sexual assaults and was never designated as a perpetrator under PREA. ECF No. 51 at 8-9.

As an initial matter, the undersigned finds Plaintiff fails to state a § 1983 claim based on an alleged violation of the PREA. "The PREA address[es] the problem of rape in prison, authorizes grant money, and creates a commission to study the issue." *De'lonta v. Clarke,* No. 7:11-cv-00483, 2013 WL 209489, at *3 (W.D.Va. Jan. 14, 2013). Because § 1983 itself does create any rights,[9] and the text and structure of the PREA provide no indication that Congress intended to create new individual rights, there is no basis for a private right of action for inmates to sue prison officials for noncompliance with the Act. *See Chapman v. Willis*, No. 7:12-CV-00389, WL 2322947, at *3-4 (W.D.Va. May 28, 2013); *Ball v. Beckworth*, No. CV 11-00037, 2011 WL 4375806, at *4 (D.Mont. Aug. 31, 2011) (citing cases).

Returning to the due process/failure to protect § 1983 claim analysis, the undersigned does find that Plaintiff has established that she suffered a significant or serious physical injury as a result of the September 18, 2010 attack. Plaintiff was hospitalized following the attack, required multiple stiches to close the wound on her face, and has a permanent scar on her face. Addressing the second prong of this constitutional claim, the court considers whether Plaintiff has offered sufficient evidence to show that Defendants knew that an altercation was likely to occur or that Plaintiff was in need of protection from Inmate Tyler. The undersigned finds Plaintiff has submitted evidence to defeat Defendants' Motion for Summary Judgment on this ground. The record shows that Plaintiff complained on numerous occasions to the Defendants in this case about her concerns about Inmate Tyler hitting her, stalking her, and threatening her. Although Plaintiff was offered protective custody on August 26, 2010, approximately 23 days before the assault on September 18, 2010, it is clear from the testimony in the record that

---

[9] *Doe v. Broderick*, 225 F.3d 440, 447 (4th Cir.2000) (internal citations omitted).

Plaintiff's and Tyler's confrontations continued to escalate. Defendants' argument here notwithstanding, there is no evidence that after the initial offer of protective custody was made that any of the Defendants made a subsequent offer of protective custody.  Further, even though Plaintiff stated that she was aware that she could go into protective custody at any time, there is evidence in the record that Plaintiff believed she had an alternative to being placed in protective custody because she testified that she was told by SCDC officers that she would be moved. Additionally, there is testimony in the record that, on the day of the attack, Plaintiff informed Defendant Austin that Inmate Tyler was after her and that she was afraid to walk where Tyler was standing, and that Defendant Austin just laughed and told Plaintiff to continue walking. Finally, although Defendants argue that Plaintiff's less than candid communications with Tyler led to "the likelihood that Inmate Tyler would respond," the undersigned finds that there is conflicting testimony in the record concerning Plaintiff's interactions with Tyler, and the possible reasons for these interactions. Although Defendants imply that Plaintiff was leading Tyler on, both Plaintiff and other inmates testified that Plaintiff was interacting with Tyler against her wishes and that Plaintiff was doing what she needed to do to try to keep herself safe. Perhaps Plaintiff could have acted differently. However, given the evidence, a reasonable jury could conclude Plaintiff's actions were appropriate under the circumstances. Considering Inmate Tyler's disciplinary history while incarcerated at Leath, Defendants' knowledge about Inmate Tyler's propensities, together with the facts as noted above, the undersigned finds that there is a question of fact as to whether Defendants failed to protect Plaintiff from Inmate Tyler's assault. The court should deny Defendants' Motion for Summary Judgment on the due process claim.

3.   Qualified Immunity

Defendants assert that they are entitled to qualified immunity as to the § 1983 cause of action because "reasonable officers would not know that these Defendants' action were unlawful under the circumstances surrounding Plaintiff's confinement." ECF No. 27-1 at 9.   The Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), established the standard that the court is to follow in determining whether a defendant is protected by this immunity. That decision held that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Harlow*, 457 U.S. at 818.

When evaluating a qualified immunity defense, the court must determine (1) whether the facts alleged, taken in the light most favorable to the plaintiff, show that the defendants' conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the alleged misconduct.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  The two prongs of the qualified immunity analysis may be addressed in whatever order is appropriate given the circumstances of the particular case.  *Id.* at 236.  In determining whether the right violated was clearly established, the court defines the right "in light of the specific context of the case, not as a broad general proposition."  *Parrish v. Cleveland*, 372 F.3d 294, 301 (4th Cir. 2004). "If the right was not clearly established in the specific context of the case—that is, if it was not clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted—then the law affords immunity from suit."  *Id.*  (citations and internal quotation omitted).

The undersigned finds that, at the time of the alleged misconduct, it was clearly established that the Eighth Amendment imposes a duty on prison officials "to protect prisoners

18

from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. at 833 (citation omitted). As discussed in the preceding section, there is a question of fact as to whether Defendants violated this constitutional right, therefore, the court cannot determine at the summary judgment phase that Defendants' actions were objectively reasonable for purposes of granting qualified immunity. *See Peoples v. Lloyd*, C/A No. 1:08-3958-CMC, 2010 WL 3951436 (D.S.C. Oct. 7, 2010) (denying defendant's defense of qualified immunity because issues of fact existed as to defendant's use of excess physical force and use of chemical munitions). The undersigned recommends that Defendants be denied qualified immunity at this stage.

4.  Gross Negligence Claims

Defendants contend that they exercised more than slight care in this case and the offer of protective custody was a reasonable response to the risk of harm from another inmate.  ECF No. 27-1 at 10. Defendants contend they, therefore, should be granted summary judgment on Plaintiff's claims for gross negligence and for gross negligence in supervision and training. In response, Plaintiff argues that summary judgment should be denied on her gross negligence claim because:

> When the Defendant has stated that Plaintiff cannot work in prison labor if the job has complex instructions, when the prison doctor determines that Plaintiff has borderline intellectual capacity, and when Plaintiff has been victimized in the past, SCDC owes a particular duty as delineated in PREA policy to isolate Plaintiff from aggressors like Linda Tyler.

ECF No. 39-1 at 36. Plaintiff also argues that summary judgment should be denied on her negligent supervision and training claim because:

> [Inmate] Tyler's previous sexual attacks over the previous two years should have informed SCDC that its employees lacked the necessary training and supervision to keep inmates safe at Leath Correctional Institution.  Defendant offered PREA training, had policies and procedures, and either because the employees exercised less than slight care or because they were untrained and incompetent, Plaintiff was harmed by Linda Tyler.

ECF No. 39-1 at 37.

Because the undersigned has found that the provisions of PREA are not applicable to this case, the undersigned finds that Defendants did not owe a duty to Plaintiff as outlined in the PREA policy.  However, the undersigned has found given the circumstances of this case, that there is a question of fact whether Defendants' offer of protective custody was an adequate response to Inmate Tyler's threats against Plaintiff. Accordingly, the undersigned recommends that Defendants' Motion for Summary Judgment on Plaintiff's gross negligence claims be denied.

5. Contributory Gross Negligence[10]

Defendants argue that Plaintiff's conduct constituted contributory gross negligence, and they contend that they acted reasonably and are entitled to summary judgment as a matter of law. ECF No. 27-1 at 12-13. Plaintiff argues that "if there is an argument of contributory negligence, then the case goes to the jury." ECF No. 39-1 at 38.  Plaintiff contends that Defendants are asking the court to weigh evidence, and Plaintiff requests that the court decline to do so.  *Id.*

Under South Carolina law, gross negligence is defined as "a failure to use even slight care or as 'negligence so gross and reckless as to amount to willfulness.'"  *Craven v. Southern Ry. Co.,* 412 F.2d 835 (4th Cir. 1969).  South Carolina courts have "adopted a modified version of comparative negligence known as the 'less than or equal to' approach," by which the plaintiff in a negligence action could recover damages if his or her negligence is 50% or less or, stated another way, if the plaintiff's negligence does not exceed 50%. *Singleton v. Sherer*, 659 S.E.2d

---

[10] Although Defendants title this Section as "Contributory Gross Negligence," South Carolina abolished the doctrine of contributory negligence in 1991 and adopted comparative negligence as its tort standard.  Under comparative negligence "a plaintiff in a negligence action may recover damages if his or her negligence is not greater than that of the defendant." *Berberich v. Jack*, 709 S.E.2d 607, 611 (S.C. 2011) (internal citations omitted).

196, 206 (S.C. Ct. App. 2008). When conflicting inferences can be drawn, the determination of respective degrees of negligence attributable to the plaintiff and the defendant presents a question of fact for a jury. *Hurd v. Williamsburg County*, 611 S.E.2d 488, 492 (S.C. 2005).

Given the issues of fact as outlined above, the undersigned is unable to determine as a matter of law that Plaintiff's conduct constituted gross negligence that exceeded 50% of the total gross negligence, and recommends that Defendants' Summary Judgment Motion be denied on this ground.

V.     Conclusion and Recommendation

Based on the foregoing, it is recommended that the Defendants' Motion for Summary Judgment, ECF No. 27, be DENIED.[11]

IT IS SO RECOMMENDED.

July 25, 2013                                                     Kaymani D. West
Florence, South Carolina                                United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

---

[11] In her Response to Defendants' Motion for Summary Judgment, Plaintiff dismissed her assault and battery claim against the Defendants. ECF No. 39-1 at 38. Accordingly, Plaintiff's causes of action for assault and battery should be dismissed.